PITTMAN, Judge.
Karon Clore (“the wife”) appeals from a judgment of the DeKalb Circuit Court dissolving her marriage to Gregory Clore (“the husband”), challenging the alimony and property-division aspects thereof, and also seeks review of a postjudgment order of that court that, among other things, denied the wife’s requests for a new trial and for recusal of the trial judge because of his social-networking connection to the parties’ adult daughter. We affirm.
In September 2010, the husband initiated a divorce action alleging that the parties had married in 1984, that they had separated, that no children of the parties remained minors, and that the marriage should be dissolved on multiple grounds, including incompatibility of the parties, an irretrievable breakdown of the marriage, and the wife’s “adultery with diverse persons.” The wife answered and asserted a counterclaim seeking a divorce solely on no-fault grounds. In October 2010, the parties reached an agreement, pursuant to which the trial court ordered the husband to pay the wife the sum of $11,000 “as ...
a portion of any final property division between the parties” incident to the parties’ divorce and also ordered the husband to pay the wife $400 every two weeks.
An ore tenus proceeding in the cause was held on March 9, 2012, after which the trial court entered a judgment divorcing the parties, without specifying a particular statutory ground for granting that relief. The judgment contains the following pertinent findings of fact:
“The parties were married on July 21, 1984. At that time, the [wife] was employed as a teacher, teaching the subjects of typing and shorthand. She received her bachelor’s degree from Radford University and had been teaching for about one year as of the date of the marriage. The [husband] also received his bachelor’s degree from Rad-ford University. He has been continuously employed during the marriage.
“The parties’ have one child who is now an adult. She was born in 1987. In 1988, the parties decided that the [wife] should quit her job and raise their child full time. At that time, the parties moved from Virginia to Alabama. The [wife] never received tenure as a teacher. She has no pension plan or retirement fund.
“The [husband] testified that over the years he had encouraged and/or asked the [wife] to find employment. He stated that she told him that she did not want to work. The [wife] denied that he had asked her to return to work. She stated that her degree is now obsolete and that she will have to return to college in order to prepare to reenter the workforce. She stated repeatedly at trial that she had not sought employment since the parties separated in September 2010 because she wants ‘a career, not a job.’
*267 “Throughout the marriage, the [husband’s] employment caused him to travel. He was on the road anywhere from two to five days per week. He still travels for work, averaging approximately two days per week. He earns a salary of approximately $104,000.00 per year. In addition, he receives quarterly commissions that average anywhere from $8,000.00 to as high as $10,000.00 per quarter. He stated that his 2010 compensation was approximately $115,000.00 to $118,000.00. He was unable to give an accurate salary range for other years. It is undisputed that the [wife] does not have a job and has not had a job for a number of years.
“The parties’ assets consist of: a house they built 11 years ago, the furnishings of that house, a retirement account in the [husband’s] name with a balance of approximately $520,000.00, and a 2004 Toyota Sequoia [automobile] that the [wife] drives. The [husband] does not own a vehicle as he is provided a car by his employer. The [husband] testified that at the time of the parties’ separation, his retirement account had a balance of approximately $450,000.00.
“The parties have two debts: the first mortgage on the marital residence in the approximate amount of $278,000.00 and a second mortgage on the house, taken out as a home-equity line of credit, in the approximate amount of $95,000.00.
“The [husband] lays the blame for the breakdown of the marriage primarily on the [wife]. He alleged, and she admitted, that the [wife had] had an affair in 2010 that, when he found out for certain that such had occurred, caused the separation and caused him to file for divorce. Despite her admission to having an affair with another man, the [wife] lays the blame primarily on the [husband], claiming that he was mentally and physically abusive to her during the marriage. The [husband] denies any such abuse. Other than the [wife’s] testimony to said abuse, the [trial court] was presented with no evidence to substantiate it.
“The [husband] states that the marital home would not sell on the real estate market for more than the combined mortgages, a total of approximately $873,000.00. He stated that the house at one time appraised for $450,000.00 but that it would not bring that sum in the current market. The house has been for sale, without a real estate company or agent contracted to sell it, for two and one-half years. The [husband] testified that currently there is no one looking at the house and that there have been no calls about the house in some time. The house is 5,972 square feet with five bedrooms and five and one-half baths. The [wife] claims that the house is worth approximately $650,000.00.
“The [wife] claims that she has lost $917,000.00 during the marriage by not being employed. She stated that at a minimum it would cost her $74,000.00 to obtain a degree that would allow her to reenter the workforce. She caused to be admitted [her] Exhibit ‘5’ which is a list of her estimated monthly expenses. She estimates that her expenses are $4,070.00 per month. This figure includes an estimate of $1,200.00 per month for rent. Her current rent is $710.00 per month, with her water service included. However, she wants to move to a nicer apartment and speculates that it will cost $1,200.00 per month.
“Pursuant to [the trial court’s order] of October 26, 2010, the [husband] has paid $800.00 per month to the [wife] in temporary spousal support. That Order also required him to pay to the [wife] $11,000.00 as a property settlement, the *268 amount of which is to be considered by the [trial court] during its final property division.
“The [husband] caused to be admitted [his] Exhibit ‘1’ which is a list of his monthly expenses, showing $5,276.94 in expenses. That same Exhibit shows a monthly net income of $5,118.82. The [husband] acknowledged that this income figure did not include the quarterly commissions that he is paid. The expenses include the temporary spousal support as well as payments on both of the mortgages. The mortgage payments total $2,720.00 per month.
“[The husband’s] Exhibit ‘2’ is a list of home furnishings still in the marital residence. That Exhibit shows that the items are worth a total of $55,145.00. [His] Exhibit ‘3’ is a list of items that [he] claims the [wife] removed from the marital residence, totaling $13,828.00. [The wife] stated that she did not remove any furnishings from the home upon the separation. However, she did admit to taking a $3,800.00 painting of her daughter because [the wife’s] mother paid for it. She gave it back to her mother. She also took a couple of wreaths [and] a television that had been given to the parties’ daughter for graduation, which the [wife] then gave to her mother. She stated that she did not take any of her daughter’s clothes.
“[The husband’s] Exhibit ‘2’ also lists $2,283.36 in expenses paid by the [wife] for hotel stays and meals that the [husband] alleged were for ‘affair trip expenses.’ The testimony at trial was that the [husband] found credit card charges for multiple hotel stays, as well as meals, that he alleged were for the [wife] and her paramour. The [wife] testified that she met her paramour in a hotel only one time.
“[The husband’s] Exhibit ‘3’ also displays expenses related to home repairs, utility costs and to the [wife’s] medical expenses in the amount of $5,164.00.
“The [wife] caused to be admitted [her] Exhibit ‘4’ which is two lists she compiled of the household furnishings. She requested the [trial court] to award the contents of one list to her and the other to the [husband]. She stated that the contents of both lists are approximately equal in value. The [husband] does not want the [trial court] to divide the furnishings in this manner.
“The [husband] initially stated that the [wife] should receive no value from the house. Eventually, he stated that the [wife] should be entitled to some of the equity in the home, if any exists, but that the division should not be equal between the parties. He stated that the [wife] should not be provided any of the funds he has in retirement. His reason for his position on these assets is that the [wife] had an affair and caused the breakdown of the marriage.
“The [wife] wants a share of the equity in the home, a share of the [husband’s] retirement fund, and alimony. The [husband] is 53 years old. The [wife] is 50 years old. The [wife] testified that she worked in the home for the vast majority of the marriage so that the [husband] could advance in his employment. She is healthy and is physically able to work. She has not applied to any schools, or for any employment, since the parties’ separation. She has been waiting for the divorce to be made final. She stated that she is willing to pay her own living expenses once she completes her re-education.
“The [wife] stated that the [husband] should be allowed to live in the marital home, but that it should be listed for sale with a real estate agent. She stat *269 ed that the [husband] should pay all the payments on the house, as he has been doing, until it is sold. She has no intentions to return to DeKalb County.
“The parties bought a [Lexus] SUV [automobile] in 2007. The [husband] stated that this was bought for their daughter and that he sold it once she moved to London, UK, with her husband. The [wife] stated that she did not know, until it was said in court, that the [Lexus] was sold. She wanted the [trial court] to award it to her. Instead, she wants the [trial court] to consider the fact that that vehicle has been sold when it makes a property division. The [trial court] does so consider the sale of that vehicle.
“The parties both testified that, other than the retirement account, they have no other investment accounts. The [husband] stated that he had a checking account with a balance of approximately $646.00. He stated that he had no cash. He stated that if he had to pay more than $800.00 per month in alimony, then he would not be able to make the mortgage payments on the marital residence.”
(Emphasis added.)
The trial court’s division of property incident to its judgment divorcing the parties is expressly stated to have been determined after the trial court had “considered] all relevant factors under Alabama law, including the respective fault of the parties for the breakdoum of the marriage ” (emphasis added). The judgment directs the marital home to be placed for sale with a real-estate agency within 80 days and that, if the home does not sell within 1 year thereafter, the parties may seek a judicial sale of the home; under the judgment, a two-thirds share of the net proceeds of any sale remaining after satisfaction of outstanding mortgages is to be allocated to the husband and a one-third share of the proceeds is to be allocated to the wife. The wife was similarly awarded $150,000 of the husband’s retirement account, an amount that represents one-third of the value of that account as of the parties’ separation. The wife further received the 2004-model Toyota Sequoia automobile and all personal effects in her apartment; the husband received all household furnishings in the marital home, the painting of the parties’ daughter that had been removed from the home, certain antique vases, and the right to occupy the home until its sale (with the corresponding duty to make all mortgage payments).
The trial court also awarded the wife 18 months of rehabilitative alimony in the amount of $800 per month after having considered “the parties’ standard of living during the marriage, future prospects, potential for maintaining their standard of living after the divorce, ages and health, education, length of marriage, source of common property and conduct with reference to the cause of the divorce ” (emphasis added). The trial court expressly reserved the right to award “further periodic alimony” for future consideration to the extent that such a reservation might have formerly been necessary to preserve the power to make such an award upon a proper modification request (but see Enzor v. Enzor, 98 So.3d 15, 22 (Ala.Civ.App.2011) (holding that a time-delineated award of rehabilitative alimony, a subclass of periodic alimony, preserves judicial power to consider granting further periodic alimony “at any time, on petition of either party, before the award expires”)).
The wife filed a postjudgment motion seeking a new trial that, among other things, assailed the equity of the trial court’s property division and alimony award and asserted, for the first time, that *270 the existence of a social-networking connection between the parties’ adult daughter and the trial judge warranted the grant of a new trial and the recusal of the trial judge. The trial court, in its subsequent dispositive order, made certain adjustments to the mechanics of the sale of the marital residence, but otherwise it denied the wife’s motion.
The first issue raised by the wife concerns the propriety of the alimony and property-division provisions of the divorce judgment, as to which the following review principles apply:
“Generally, the trial court has wide discretion over the award of alimony and the division of property, and it may use whatever means are reasonable and necessary to divide the parties’ property equitably. In dividing property and awarding alimony, the trial court may consider several factors, including the parties’ respective present and future earning capacities, their ages and their health, their conduct, the duration of the marriage, and the value and type of marital property. This court must consider the issues of property division and alimony together when reviewing the judgment of the trial court. The trial court’s property division and alimony award will not be set aside on appeal absent an abuse of discretion.”
Daniel v. Daniel, 841 So.2d 1246, 1249 (Ala.Civ.App.2002) (emphasis added; citations omitted).
In this case, both parties are college-educated adults in their early fifties and in relatively good health. Although the wife had not been involved in the workforce since 1988, during the infancy of the parties’ now-adult child, she continues to hold a business-education degree and she has previous experience teaching keyboarding skills and accounting at the post-secondary level; the trial court could well have credited the husband’s testimony to the effect that the -wife could refresh her teaching credentials with relative ease by taking teacher-certification classes or could, with some additional education, enter some different profession.
The principal properties of any worth held by the parties are the marital home, which is subject to significant indebtedness and, according to the husband’s testimony, would not yield significant net proceeds, and the husband’s retirement account, which as we have stated was worth $450,000 at the time of the parties’ separation in September 2010 (the same month during which the divorce action was filed). The wife was awarded one-third of any net proceeds from the sale of the home and one-third of the retirement benefits within the trial court’s consideration. To the extent that the wife intimates in her brief on appeal that approximately $70,000, representing the appreciation in value of the husband’s retirement account after the filing of the divorce complaint, is to be considered in determining the equity of the property division, our caselaw is to the contrary. See Smith v. Smith, 964 So.2d 663, 669 (Ala.Civ.App.2005) (under Ala. Code 1975, § 30-2-51 (b), a retirement-benefits award incident to a divorce may not properly include “postcomplaint retirement benefits[] and income and appreciation thereon”). Further, the inclusion of a sports-utility vehicle, apartment furnishings, and a previous payment of $11,000 in the wife’s estate and the inclusion of marital-home furnishings in the husband’s estate has not been shown to have substantially affected the trial court’s apparent design to award the wife one-third of the parties’ divisible assets.
*271 The wife points to a number of cases in her brief in which we determined to be inequitable awards of marital property to divorcing spouses of between 19 and 29 percent of the marital assets available to be considered for division. However, as we have noted, the trial court is also permitted to take into consideration, in dividing marital property, the conduct of the parties with respect to the dissolution of the marriage. Daniel, 841 So.2d at 1249. Although the trial court did not state that it was divorcing the parties on the basis of the wife’s adultery, which is a ground that will support a determination that parties to a marriage should be divorced, see Ala. Code 1975, § 30 — 2—1 (a)(2), we have squarely held that “the trial court may ... consider the conduct of the parties with regard to the breakdown of the marriage, even where ... the trial court failed to specify the grounds upon which it based its divorce judgment.” Pate v. Pate, 849 So.2d 972, 976 (Ala.Civ.App.2002) (affirming award of less than half of marital assets to adulterous divorcing spouse).
The trial court’s judgment, before noting that “the respective fault of the parties for the breakdown of the marriage” had been taken into consideration by the trial court, refers specifically to both the husband’s testimony regarding his discovery of the wife’s having had a sexual liaison with another man (which liaison she admitted having had) and the presentation of documentary evidence detailing, the husband alleged, the wife’s credit-card charges for multiple hotel stays and shared meals with her paramour; in contrast, the judgment indicates the trial court’s disbelief of the wife’s suggestions that the husband was guilty of misconduct in the form of mental and physical abuse, noting that “[ojther than the [wife’s] testimony to said abuse, [the trial court] was presented with no evidence to substantiate it.” We conclude that the trial court could properly have determined that the wife, having engaged in the conduct that precipitated the dissolution of the marriage, should receive a smaller proportion of the fruits thereof.
Similarly, we find no error with respect to the $800-per-month award of rehabilitative periodic alimony for 18 months. Although the wife testified that she expected to incur monthly expenses of over $4,000, the trial court noted that some of those expenses were somewhat inflated by her expectation of relocation from her current apartment in Tennessee; further, the wife declined to seek or obtain work during the pendency of the action, indicating her ability to subsist upon the $800-per-month pendente lite alimony award that matched the monthly monetary level of the alimony award in the final judgment. Also, as we have noted, the wife’s relative health and educational background also make her a candidate to reenter the workforce so as to support herself. Finally, the wife’s adultery leading to the dissolution of the marriage supports the trial court’s judgment as to this issue, given that under Alabama law misconduct of a recipient spouse may be considered as abridging that spouse’s alimony claim even when that misconduct is not recited as a ground for the divorce. Plaskett v. Plaskett, 348 So.2d 784, 788 (Ala.Civ.App.1977). We conclude that the trial court did not act outside its discretion awarding periodic alimony to the wife.
The second issue raised by the wife concerns the trial court’s denial of the wife’s new-trial motion asserting, in pertinent part, that the trial judge’s social-networking connection to the parties’ adult daughter warranted the grant of a new trial and the recusal of the trial judge. The record reveals that, at the hearing on the wife’s motion for a new trial, counsel for the wife, *272 for the first time, introduced a photocopy of an Internet Web page taken from his own account on the social-networking Web site facebook.com that showed that the parties’ daughter, who grew up in the trial venue but who now lives in London, England, and the trial judge are “Facebook friends.” The trial court, in explaining his decision to deny the motion, stated, in pertinent part:
“This [Facebook] is a social networking site where the word ‘friend’ is used [in a way] that doesn’t have anything to do with the way before this Face-book.com ever existed — the way we used the word ‘friend.’
“So just because a person is connected to me on here in this manner doesn’t have anything to do with a personal relationship. I don’t have a personal relationship with this friend. We all live in a small town. I have heard both of you all’s names. I’ve heard [the daughter’s] name before we came in here today.
“And in fact, in the course of living here, we have all run into each other before. It — and I can say the same for [the daughter], I can’t remember a specific time when that happened.
“But the establishment of an electronic friend over Facebook has absolutely no impact on what I have done and what I’m going to do.”
The parties, in their appellate briefs, devote considerable argument to various secondary authorities assessing the abstract propriety of a “Facebook friendship” between, for example, a trial judge and a practicing attorney. However, the husband points out that at the new-trial-motion hearing the wife “offered nothing beyond the bare status of the parties’ daughter as a ‘friend’ of the judge.” Notably, the record reveals that the wife did not make any sort of showing with respect to the second of the two elements necessary to warrant the granting of a new trial based upon newly discovered evidence of a trial judge’s potential bias: that the pertinent evidence indicating bias that was discovered after trial “could not have been discovered before trial by the exercise of due diligence.” Ex parte Kenneth D. McLeod, Sr., Family Ltd. P’ship XV, 725 So.2d 271, 278 (Ala.1998) (holding that denial of new-trial motion raising issue of party’s financial contribution to trial judge’s political campaign was proper because contribution had been publicly disclosed months before trial and “unquestionably could have been detected”).
For all that appears in the record in this case, the existence of the electronic connection between the parties’ daughter and the trial judge — whether indicative of a mere acquaintanceship as the trial judge noted on the record or something more private and sinister as insinuated by the wife — was discoverable by the wife’s counsel well before trial and does not amount to a basis for retroactively undoing the work of the trial court, especially given that under the law of Alabama “[prejudice on the part of a judge should not be presumed.” Duncan v. Sherrill, 341 So.2d 946, 947 (Ala.1977) (stating principle and affirming denial of new-trial motion based upon allegation of bias stemming solely from fact that the plaintiff, a first-grade schoolteacher, had taught the judge’s daughter). We thus decline to reverse the judgment under review based upon the second and final issue raised by the wife.
Based upon the foregoing facts and authorities, the trial court’s judgment is affirmed. The wife’s request for an award of an attorney’s fee on appeal is denied.
AFFIRMED.
*273 THOMAS, MOORE, and DONALDSON, JJ., concur.
THOMPSON, P.J., dissents, with writing.